UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHIYO HARRIGAN,

   Plaintiff,

  v.

COMMISSIONER OF SOCIAL SECURITY,

   Defendant.

No.  2:25-cv-0891-DJC-SCR

FINDINGS AND RECOMMENDATIONS

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-34.[1]  For the reasons that follow, the undersigned recommends granting Plaintiff's motion for summary judgment, denying Defendant's cross-motion, and remanding for further proceedings.

**I. PROCEDURAL BACKGROUND**

Plaintiff applied for DIB on February 3, 2022, alleging disability beginning March 10, 2020.  Administrative Record ("AR") 17.[2]  The application was disapproved initially and on

---

[1] DIB is paid to disabled persons who have contributed to the Disability Insurance Program, and who are unable to work as the result of a mental or physical disability.  42 U.S.C. § 423(a)(1); *Bowen v. City of New York*, 476 U.S. 467, 470 (1986).

[2] The AR is filed as ECF No. 7 (AR 1 to AR 1466).

1

reconsideration.  AR 17.  On February 13, 2024, ALJ Richard Breen presided over a telephonic hearing on the disapprovals.  AR 30-63 (transcript).  Plaintiff appeared with counsel and testified at the hearing.  AR 30, 34.  A Vocational Expert ("VE") also testified.  AR 57-58.

On April 8, 2024, the ALJ issued an unfavorable decision, finding Plaintiff "not disabled" under the Act.  AR 17-25 (decision), 26-29 (exhibit list).  On February 11, 2025, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner.  AR 1-5 (decision and additional exhibit list).

Plaintiff initiated this action on March 19, 2025.  ECF No. 1.  The parties filed cross-motions for summary judgment based on the AR filed by the Commissioner.  ECF Nos. 8 (Plaintiff's summary judgment motion), 10 (Commissioner's summary judgment motion).  Plaintiff then filed a reply brief in support of his motion.  ECF No. 11.

## II.  FACTUAL BACKGROUND

As of the date last insured ("DLI"), December 31, 2022, Plaintiff was 52 years old and accordingly deemed a person closely approaching advanced age under the regulations.  AR 19, 237; *see* 20 C.F.R §§ 404.1563(d).  Plaintiff has finished two years of college and can communicate in English.  AR 229, 231.  She worked in office jobs until March 2020.  AR 39, 231.  Her asserted conditions include back pain, neck pain, hip pain, shoulder pain, pain on the right arm radiating down to the fingers, and degenerative disc disease ("DDD").  AR 230.

## III.  LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld "if it is supported by substantial evidence and if the Commissioner applied the correct legal standards."  *Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1011 (9th Cir. 2003).  "'The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive[.]'"  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (quoting 42 U.S.C. § 405(g)).

Substantial evidence is "more than a mere scintilla," but "may be less than a preponderance."  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).  "While inferences from

the record can constitute substantial evidence, only those 'reasonably drawn from the record' will suffice." *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted).

Although this court cannot substitute its discretion for that of the Commissioner, the court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Desrosiers v. Secretary of HHS*, 846 F.2d 573, 576 (9th Cir. 1988); *see also Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985) ("The court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion; it may not affirm simply by isolating a specific quantum of supporting evidence.").

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). However, the court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007); *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003) ("It was error for the district court to affirm the ALJ's credibility decision based on evidence that the ALJ did not discuss.").

The court will not reverse the Commissioner's decision if it is based on harmless error, which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) (quotation omitted); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## IV.  RELEVANT LAW

DIB is available for every eligible individual who is "disabled." 42 U.S.C. § 423(a)(1)(E). Aside from blind individuals over the age of 55, a "disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

The Commissioner uses a five-step sequential evaluation process to determine whether an applicant is disabled and entitled to benefits.  20 C.F.R. § 404.1520(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (setting forth the "five-step sequential evaluation process to determine disability" under Title II and Title XVI).  The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.

20 C.F.R. §§ 404.1520(a)(4)(i), (b).

> Step two: Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, the claimant is not disabled.

*Id.*, §§ 404.1520(a)(4)(ii), (c).

> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is disabled.  If not, proceed to step four.

*Id.*, §§ 404.1520(a)(4)(iii), (d).

> Step four: Does the claimant's residual functional capacity make him capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

*Id.*, §§ 404.1520(a)(4)(iv), (e), (f).

> Step five: Does the claimant have the residual functional capacity perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Id.*, §§ 404.1520(a)(4)(v), (g).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  20 C.F.R. §§ 404.1512(a) ("In general, you have to prove to us that you are blind or disabled"); *Bowen*, 482 U.S. at 146 n.5.  However, "[a]t the fifth step of the sequential analysis, the burden shifts to the Commissioner to demonstrate that the claimant is not disabled and can engage in work that exists in significant numbers in the national economy."  *Hill v. Astrue*, 698 F.3d 1153, 1161 (9th Cir. 2012); *Bowen*, 482 U.S. at 146 n.5.

## V.  THE ALJ's DECISION

The ALJ made the following findings:

> 1. The claimant last met the insured status requirements of the Social

4

Security Act on December 31, 2022.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 10, 2020 through her date last insured of December 31, 2022 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: degenerative disc disease post cervical spine and lumbar spine fusions … and sacroiliitis (see, e.g., Exhibit 7F, p. 14) (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) in that she could stand and/or walk six hours and sit six hours in an eight-hour day except she could no more than occasionally perform postural activities, occasionally reach overhead bilaterally, and never work with unprotected heights or dangerous machines.

6. Through the date last insured, the claimant was capable of performing past relevant work as a Receptionist.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from March 10, 2020, the alleged onset date, through December 31, 2022, the date last insured (20 CFR 404.1520(f)).

AR 19-24.

## VI.  ANALYSIS

### A.  The ALJ Erred in Discrediting Subjective Testimony

#### 1.  Subjective Testimony

Plaintiff testified that she worked as a receptionist with various companies until 2020.  AR 35.  She then worked as a Pilates instructor for two months, having previously taken courses on and off for a few hours per week for a year to become qualified.  AR 36.  She had also worked as a notary signing agent since 2016, but only made $100 per job and never reported the minimal income from this.  AR 36-37.  She told her doctor about her notary work in September 2023, along with her hobby of making oil paintings and watercolor art.  AR 37-38.  The ALJ instructed

the VE to ignore the notary work and focus only on Plaintiff's work as a receptionist.  AR 38.

Plaintiff asserted that her problems initially stemmed from an injury in 2009, but the ALJ held he would not consider that since the alleged onset date in the application was March 2020.  AR 38-39.  Plaintiff explained that she listed March 2020 as her onset date because that was when her injury kept her from performing the advanced movements needed to complete the Pilates certification courses.  AR 39.  The ALJ explained that the question in disability applications is not whether Plaintiff is able to do what they want, but rather whether she can perform any type of work in the national economy.  AR 39-40.  When asked why she cannot, Plaintiff highlighted DDD and facette arthritis in her neck caused by fusion of her L4-L5 vertebrae.  AR 40.  Despite two disc replacements, her facette arthropathy radiates down from her neck into her arms and hands.  AR 40.  Meanwhile, the nerve root compression in her lumbar stenosis has caused her sciatica to flare up daily.  AR 40-41.  When combined with back spasms that occur a few times per day, this keeps her from sitting for long.  AR 40-41.  Conversely, she cannot stand for long because of the pain in both legs, mostly her right, when she tries to bear her own weight.  AR 41.  She started using a cane seat to sit down in line in the six months leading up to the hearing, but probably would have done it sooner had her husband not done most of the errands since 2019.  AR 41-42.

The ALJ asked about the physical requirements of working as a mobile notary.  AR 42.  Plaintiff explained that she only does jobs within a fifteen-minute drive, usually involving single documents and no more than half an hour of sitting.  AR 42.  She can sit for a total of 45 minutes in a desk chair before back spasms and lumbar pain force her to recline, move around, lie in a massage chair for an hour, or take pain medication.  AR 43-44.  Prior to the end of 2022, Plaintiff used Tylenol with codeine to treat the pain in her neck and lower back.  AR 42-43.  She did try gabapentin for the six months leading up to the hearing to try and wean herself from opioids.  AR 43-44.  She was taking Dilaudid and other heavy medicines for a while, but found they made her tired and gave her an upset stomach.  AR 54.

Plaintiff's daily routine in 2022 started with morning hygiene while standing or sitting, letting the dog out, and then eating cereal while checking her emails.  AR 45.  She would then do

6

"daily devotionals," a form of meditation meant to distract her from the pain, before sitting in the massage chair for 90 minutes. AR 45. She would get up to put away dishes, then fold and put away the laundry that her husband had finished. AR 45. She would then spend a substantial amount of time reclining on the couch, totaling about six hours in an eight-hour day. AR 45, 54.

Plaintiff testified that she needed breaks between these daily chores and had given up many hobbies that she once loved, like gardening, riding a bike, and walking. AR 53. She still tried to paint, but for maybe 30 minutes at a time. AR 53. She was washing her hair every five days instead of daily. AR 56.

The ALJ asked how her back and neck pain would keep her from working as a receptionist, a job that mostly requires sitting down. AR 46. Plaintiff responded that the repetitive movements of that job like answering the phone, pushing the button to let delivery drivers in, and moving her neck to look away from her computer were what caused her pain to develop. AR 46. This had made standing or sitting for any prolonged period difficult enough that she does not believe she can return to it full-time, having failed to return to such work on even a part-time basis. AR 46. As for button-pushing, Plaintiff alleged numbness and tingling radiating down her arms and limiting the dexterity of her hands. AR 47. This pain would amplify the results of her back spasms. AR 47. She would try to stretch, strengthen her core, improve her posture, and take walks to the bathroom every fifteen minutes, but the pain remained "from bad to worse." AR 47. Between all these symptoms, it was impossible to finish a full day. AR 47.

The ALJ asked if Plaintiff could instead work a job that required her to stand but with breaks every two hours. AR 47. Plaintiff responded that would be worse because she could only stand for up to 30 minutes at a time. AR 47, 53-54. She discovered this while working at a health club, where she struggled whenever she was not sitting down. AR 48. She eventually transferred to a position in marketing and membership at the club, allowing her to sit except when she needed to walk to perform certain duties. AR 48. A few months later, however, the club changed her duties so she was sitting for four to six hours per day, which proved to be too much. AR 48. The amount of stress that reaching put on her lower back resulted in her wearing a brace. AR 52. She had tried to get certified as a Pilates instructor specifically because she would only

7

need to stand for about 45 minutes at a time, while guiding people through exercises to help them with the same pain she was dealing with.  AR 48.  Again, however, her pain kept her from completing the more complex motions needed to get certified.  AR 48-49.

Plaintiff's pain keeps her from concentrating on instructions.  AR 49.  She estimates that she could use her hands for about 20-30 minutes before needing to stop and rest for another 20-30 minutes, with the problem worsening over the course of a day.  AR 49-51.  She could keep her neck angled to focus on a computer for about fifteen minutes at a time.  AR 51.  Between the two limitations, she estimated she could reach forward no more than a third of the eight-hour workday.  AR 51.  She also estimated that she could lift and carry about five pounds for two to three hours in a workday.  AR 54.

Additionally, Plaintiff had four different surgeries, each of which required six to nine months of post-surgery rehab before she could work at the specified exertion level.  AR 51-52.  Surgeon Dr. Oriseck also recommended injections to address her inflamed Sacroiliac ("SI") joint, and Plaintiff was appealing Workers' Compensation's denial of coverage for those injections.  AR 55.

### 2.  ALJ's Holding

The ALJ held that although Plaintiff's impairments could result in the symptoms alleged, Plaintiff's allegations as to their intensity, persistence and limiting effects were inconsistent with the evidence in the record.  AR 21.

The ALJ first noted that Plaintiff's history of neck pain stemmed from an April 2009 work-related injury, which she treated with "cervical epidural injection, subacromial bursa injection and physical therapy[,]" along with anterior and posterior fusions of the C5-C6 vertebrae in October 2015 and March 2016, respectively.  AR 21 (citing AR 290, 340-72, 374, 383, 684).  Plaintiff first complained of this pain worsening in March 2020, along with "tingling into the right upper extremity particularly in the trapezius muscles in the shoulder and lateral arm[.]"  AR 21 (citing AR 586).  A physical examination revealed a mild to moderate decrease in her cervical range of motion, tenderness on her right side as a result, "hyporeflexic triceps and biceps deep tendon reflexes on the right," slightly diminished strength on the right deltoid at 4+

out of 5, and positive Spurling's test to the right.  AR 21 (citing AR 586).  Phalen's sign and Tinel's test results at the wrists were negative, however, and her gait was within normal limits.  AR 21 (citing AR 586).

In April 2020, an MRI of Plaintiff's spine revealed neural foraminal stenosis that was more severe on the right side than the left at the C3-C4 disc; solely on the right at the C4-C5 disc; and on Plaintiff's left more than her right at the C5-C6 disc.  AR 21 (citing AR 560-61, 582).  Dr. Cam Chau did note some postsurgical change from the prior anterior fusion of C5-C6, but no acute osseous findings or other significant change compared to the results of a November 2016 MRI.  AR 21, 561.  Another MRI in September 2020 showed anterior fusion of the C5-C6 vertebrae, but no significant interval change when compared to results of a January 2017 CT scan and a December 2017 MRI.  AR 21, 567-69.  In other words, there was still "moderate canal stenosis at C5-C6, mild canal stenosis at C3-4 and C4-5, and multilevel neuroforaminal narrowing[.]"  AR 21 (citing AR 569).

In December 2020, Plaintiff underwent an anterior cervical diskectomy, disc replacement, and decompression of spinal canal and neural foramina at both the C3-C4 and C4-C5 discs.  AR 686.  At Plaintiff's first appointment following this surgery in January 2021, she reported improvement in her symptoms despite some radiating pain in the right arm and shoulder.  AR 21, 716.  Dr. Orisek reported that her range of motion was "a little stiff but quite good" at the postoperative stage.  AR 21, 716.  In April 2021, Plaintiff told Dr. Orisek that she was happy with the results of her surgery.  AR 21 (citing AR 718).

As to Plaintiff's lumbar spine, a November 2020 MRI showed moderately severe central canal stenosis at the L4-L5 vertebrae, along with general degenerative changes.  AR 21 (citing AR 672-73).  On May 19, 2021, after Plaintiff finished physical therapy with Ms. Mallory McGowan without any progress, Plaintiff was recommended for aquatic physical therapy twice a week for six weeks.  AR 21-22, 665-66.  After that yielded no improvement, Plaintiff underwent lumber diskectomy, interbody and posterior spinal fusion, insertion of an interbody spacer, and posterior nonsegmental instrumentation between the L4-L5 vertebrae in September 2021.  AR 22, 682, 719.  She reported in October that she had been able to go to a concert the previous night and

her back felt more stable than before the operation, albeit still sore.  AR 22, 722.  She reiterated her satisfaction with the results in November, notwithstanding some pain in the neck and upper back, and Dr. Orisek observed normal motor and sensory function, posture, and gait.  AR 22, 723.  Dr. Orisek's findings in December 2021 were the same, aside from Plaintiff reporting some tightness in her back when sleeping.  AR 22, 724.

On March 23, 2022, however, Plaintiff reported severe pain in her lower back, particularly on her right side and when her legs were weightbearing.  AR 22, 725.  Dr. Orisek observed severe tenderness in the sacroiliac joints, along with markedly positive sacroiliac provocative findings.  AR 22, 725.  The x-ray revealed "stable appearing L4-5 reconstruction with maintenance of anatomic reduction of the spondylolisthesis"[,] but with "extensive sclerosis indicative of chronic inflammation of the sacroiliac joints[.]"  AR 22, 725.  Plaintiff underwent physical therapy from February 14 to March 28, 2022.  AR 22, 726-48.

An August 2022 MRI scan of Plaintiff's cervical spine entailed an artifact limiting evaluation of the area between the C3 to C6 vertebrae, frustrating efforts to analyze that region.  AR 22, 841, 844.  Results showed anterior susceptibility due to multilevel surgical fusion in that region, plus mild levoconvex curvature, mild grade 1 anterolisthesis at C6-C7, mild degeneration above the previous L4-L5 fusion, and mild narrowing of the central canal at the C5-C6 vertebrae.  AR 22, 841, 844.  The physical examination revealed full motor strength in all extremities except "hand intrinsics," which had 4/5 strength, and unspecified limits in the cervical and lumbar range of motion.  AR 22, 841.  Dr. Ted Brindle recommended physical therapy and nonoperative treatment, including cervical epidural injections.  AR 22, 841.  Meanwhile, an MRI of the lumbar spine confirmed the mild degenerative changes and mild progression of the canal narrowing at the L3-L4 vertebral disc, but also observed improvement in conditions of the L4-L5 disc.  AR 22, 846.

During a December 9, 2022 electrodiagnostic study, Plaintiff exhibited tingling in "digit 5" of both hands and arthritis at the base of the thumb.  AR 1349.  The study revealed "a mild, chronic, right C7 radiculopathy without signs of ongoing denervation" with no "evidence of a peripheral neuropathy or other mononeuropathies such as median or ulnar neuropathy[.]"  AR 22,

10

1349.

In January 2023, a month after the DLI, an MRI of the lumbar spine showed multilevel lumbar spondylosis but without severe central canal stenosis at any levels.  AR 22, 1102. Meanwhile, an MRI of the sacrum coccyx revealed no bone marrow edema and unremarkable sacroiliac joints and sacral foramina, despite Plaintiff's complaint of low back pain.  AR 22, 1105.

The ALJ found that, taken together, the medical history only supported limiting Plaintiff to light work with the postural, manipulative, and environmental restrictions incorporated in the RFC.  AR 22.  He emphasized Plaintiff's treatment history, which he categorized as "conservative" and largely effective in relieving her symptoms.  AR 22.  Whatever symptoms did return were not at the same level of intensity as before surgeries and epidural injections.  AR 22. She also used only maintenance medications and Tylenol with codeine for pain management, with no side effects, further undermining her argument that the injuries and pain were as limiting as alleged.  AR 22.

The ALJ also held that Plaintiff's daily activities were inconsistent with the level of impairment alleged.  AR 22.  She had testified to tending to her personal hygiene without help, putting away dishes, and folding clothes.  AR 22.  A December 2022 progress report noted that she walks two to three miles per day, does Pilates for 45 minutes twice a month, gardens twice a month, bikes for ten miles once per month, and does 30-minute body weight exercises twice a month.  AR 22-23, 1328.  The ALJ also noted that Plaintiff worked infrequently as a mobile notary public for shorter visits, and part-time at the fitness club as a Pilates instructor and marketing team member.  AR 23, 1328.  He interpreted these activities as proof that Plaintiff could perform basic work functions.  AR 23.  He acknowledged that they do not prove Plaintiff could perform work activity, but also held that they do not support her allegations of disabling pain or show that she is unable to perform such work activity.  AR 23.

### 3.  Governing Law

Evaluating a claimant's subjective testimony is a two-step process.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying

11

impairment which could reasonably be expected to produce the pain or other symptoms alleged. In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (internal citations omitted). Objective medical evidence of the pain or fatigue itself is not required. *Id.* Second, if the claimant succeeds in providing objective evidence of the impairment and "there is no evidence of malingering," the ALJ can only reject the claimant's testimony about the severity of such symptoms if there are "'specific, clear and convincing reasons for doing so.'" *Id.* at 1014-15 (internal citations omitted); *see also Smartt v. Kijakazi*, 53 F.4 489, 494 (9th Cir. 2022) (applying this standard even "[w]hen objective medical evidence is inconsistent with a claimant's subjective testimony").

While an ALJ's credibility finding must be properly supported and sufficiently specific to ensure a reviewing court the ALJ did not "arbitrarily discredit" a claimant's subjective statements, an ALJ is also not "required to believe every allegation" of disability. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). So long as substantial evidence supports an ALJ's credibility finding, a court "may not engage in second-guessing." *Thomas*, 278 F.3d at 958.

Evaluating the "intensity and persistence" of the symptoms of an impairment will involve considering all available evidence, including "medical history, the medical signs and laboratory findings, and statements about how…symptoms affect" the plaintiff. 20 C.F.R. § 404.1529(a). Relevant factors include:

> (ii) The location, duration, frequency, and intensity of your pain or other symptoms; […]
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; [and]
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.);

20 C.F.R. § 404.1529(c). As to the fourth and fifth factors (i.e., "iv" and "v" directly above), the

Ninth Circuit permits ALJs to consider "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (quoting *Fair*, 885 F.2d at 603); *see also Plummer v. Berryhill*, Case No. 2:16-cv-00753-AC, 2017 WL 2972461 at *6 (E.D. Cal. July 12, 2017) (agreeing with the ALJ that "failure to pursue recommended treatment discredited…[plaintiff's] subjective testimony.").

An ALJ should not penalize claimants "for attempting to lead normal lives in the face of their limitations." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). An ALJ can, however, cite a claimant's daily routine to the extent that it is inconsistent with the degree of disability that plaintiff alleges. *See Molina*, 674 F.3d at 1113 (even where claimant's everyday activities reflect difficulty in functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment).

4.  The ALJ's Interpretation of the Medical History is Incomplete

The analysis of Plaintiff's subjective testimony begins with a three-paragraph summary of Plaintiff's test results and treatment history from April 2009 through the DLI. AR 21-22. Plaintiff argues that this record is irrelevant because under *Burch*, an ALJ may not reject symptom allegations based solely on inconsistencies between the allegations and the objective medical findings in the record. ECF No. 8 at 14 (citing 400 F.3d at 680). This argument misstates the holding in *Burch*, which is that the rejection cannot be "based solely on a *lack* of medical evidence to *fully corroborate* the alleged severity of pain." 400 F.3d at 680 (emphasis added). This principle recognizes "that pain testimony may establish greater limitations than can medical evidence alone." *Id.* In *Smartt*, the Ninth Circuit contrasted this against the acceptable practice of discounting testimony because "the record contains conflicting evidence" in relation to such testimony. 53 F.4th 489, 498 (9th Cir. 2022). The question becomes whether the cited medical evidence is not consistent with the level of impairment Plaintiff alleges, which the Court addresses below.

Plaintiff also argues that this summary includes the ALJ's lay interpretation of medical evidence like imaging results, which exceeds his authority. ECF No. 8 at 13 (citing *Bufkin v. Saul*, 836 Fed. Appx. 578, 579 (9th Cir. 2021)). But as Defendant notes, the Ninth Circuit has

13

acknowledged "a presumption that ALJs are, at some level, capable of independently reviewing and forming conclusions about medical evidence to discharge their statutory duty to determine whether a claimant is disabled and cannot work." *Id.*; ECF No. 10 at 8; *Farlow v. Kijakazi*, 53 F.4th 485, 488 (9th Cir. 2022). Even in *Bufkin*, the Ninth Circuit found that the ALJ did not rely on her own lay interpretation, but rather summarized the medical evidence from different sources. 836 Fed. Appx. at 579. Defendant correctly notes that the ALJ here did the same, often quoting the examining physician's assessments of the various examination results. *See, e.g.,* AR 22 (quoting AR 569's finding of "Moderate canal stenosis at C5-C6[,] Mild canal stenosis at C3-C4 and C4-5[, and] Multilevel neuroforaminal narrowing.")

Plaintiff's most compelling argument, however, is that an ALJ's summary of medical evidence is insufficient when it does not identify specific discrepancies between that evidence and Plaintiff's testimony. ECF No. 8 at 13 (citing *Triechler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102-03 (9th Cir. 2014)). Defendant's response primarily restates this summary, highlighting doctor visits that revealed some improvements over past visits, before reiterating that contradictions between testimony and the medical record merit discounting the former. ECF No. 10 at 7-8 (citing *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008)). While this is true, a "vague allegation that a claimant's testimony is not consistent with the objective medical evidence, without any specific findings in support of that conclusion, is insufficient[.]" *Contreras v. Saul*, 477 F.Supp.3d 1107, 1122 (S.D. Cal. 2020) (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014)). Accordingly, the court in *Contreras* found that an ALJ who summarized the record but "failed to identify *specific* statements from Plaintiff's testimony or functional report that were not credible" had not articulated the reason for discounting the testimony. 477 F.Supp.3d at 1121-22 (emphasis original).

The ALJ here made the same error as did the ALJ in *Contreras*. He summarized all relevant medical evidence in a single three-paragraph passage, albeit with separate paragraphs for different portions of the spine. AR 21-22. At the end of the third paragraph, he generally asserted that this evidence "fails to establish that the claimant was unable to perform all work

14

activity as she alleges" and that the limitations that were found credible are part of the RFC.  AR 22.  As a threshold matter, the precise wording suggests the ALJ asked whether the records corroborated her testimony and not whether they contradicted it (see *supra*; *Burch*, 400 F.3d at 680; *Smartt*, 53 F.4th at 498).  In any case, the ALJ failed to articulate which portions of the evidence discredit which portions of Plaintiff's testimony, leaving the reader to guess based on the limitations in the RFC.

The ALJ's analysis of the medical record was insufficient to discount Plaintiff's subjective testimony.

> ### 5.   The ALJ Erred in Discounting Subjective Testimony Based on Treatment

A relevant factor in assessing a plaintiff's functional limitations is how her functioning is affected by medication or other forms of treatment.  20 C.F.R. §§ 404.1520a(c)(1).  The Ninth Circuit has interpreted this to mean that courts can rely on the fact that the plaintiff was only prescribed "routine and conservative treatment" which includes "treat[ment] with an *over-the-counter pain medication*[.]"  *Christine G. v. Saul*, 402 F.Supp.3d 913, 926 (C.D. Cal. 2019) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995); *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008)).  Accordingly, Defendant cites Plaintiff's testimony that she used maintenance medication, like Tylenol with codeine, to control her pain during the relevant period.  ECF No. 10 at 9 (citing AR 44).

The cited testimony does not suggest that these medications reduced her pain to the point that she would be able to work.  In fact, that Plaintiff testified to using gabapentin after the relevant period, which suggests that Tylenol might not have been effective during it.  AR 44.  District courts have noted that gabapentin, among other prescription medications, is only used to treat severe pain.  *See Eldridge v. Berryhill*, 2018 WL 2357147, at *9, n.12 (S.D. Cal. May 23, 2018).  Nor do the pages the ALJ cited in the relevant portion of his decision establish that the prescriptions had no side effects.   AR 22 (citing AR 232, 245).

The decision also admits that this pain medication was one part of a larger treatment regiment that included injections and multiple surgeries.  AR 22.  As a threshold matter, whether the ALJ even provided sufficient basis for any discussion of Plaintiff's treatment history is

unclear.  Courts cannot label a course of treatment as conservative, and therefore as evidence that discredits subjective testimony, "absent discussion of the additional, more aggressive treatment options the ALJ believes are available." *Jones v. Dudek*, 2025 WL 1505151 at *6 (E.D. Cal. May 26, 2025) (quoting *Block v. Berryhill*, No. 2:16-cv-2230-EFB, 2018 WL 1567814 at *5 (E.D. Cal. Mar. 31, 2018) (quoting *Moon v. Colvin*, 139 F.Supp.3d 1211, 1220 (D. Or. 2015))).  At no point does the ALJ discuss more aggressive alternatives for treating the pain that Plaintiff asserts prevents her from standing, walking, or sitting for prolonged periods at a time.  The ALJ's decision to label her course of treatment as "conservative" (AR 22) was therefore unwarranted.[3]

As to the surgeries, Defendants argue that the December 2020 and September 2021 surgeries led Plaintiff to report improvement by April and October 2021, respectively.  ECF No. 10 at 8-9 (citing AR 682, 686, 716, 718, 719, 722).  Even the ALJ noted, however, that some of the pre-surgery symptoms eventually returned.  AR 22.  The question becomes whether the ALJ was correct in holding that the medical evidence suggests they were not as intense as before the surgeries.  AR 22.

On January 15, 2021, six weeks after the C3-C5 disc replacements in December 2020, Dr. Orisek reported that Plaintiff's range of motion was "a little stiff but quite good" given how early into the postoperative period she was.  AR 716.  He did, however, also note some impingement in the right shoulder, where Plaintiff reported radiating pain and "some trouble" in both the arm and shoulder.  AR 716.  Dr. Orisek's report on February 24, 2021, was largely identical.  AR 717.  Plaintiff did report on April 9 and June 2, 2021, that she was happy with the results of this operation despite continued mild impingement of the right shoulder.  AR 718-19.

On August 28, 2022, however, this procedure frustrated efforts to analyze that region of the spine via an MRI.  AR 844.  Dr. James Steidler nevertheless noted "moderate narrowing of the right neural foramen" at the C3-C4 disc, and a "[s]mall osteophyte ridge and probably mild narrowing of the central canal" at the C5-C6 disc.  AR 844.  The next day, Dr. Brindle noted only

---

[3]  Moreover, it is not clear that Plaintiff's epidural injunctions can fairly be characterized as conservative treatment.  The Ninth Circuit has expressed "doubt" that "epidural steroid shots…qualify as 'conservative' medical treatment."  *Garrison*, 759 F.3d at 1015 n.20.

4 out of 5 strength in the "hand intrinsics" and limited cervical range of motion. AR 841. By comparison, the ALJ cites March 2020 notes where Plaintiff reported "cervical pain and tingling into the right upper extremity" but "4+ out of 5" right deltoid strength and negative Phalen's and Tinel's test results on both wrists. AR 22, 586. None of the cited test results suggest that Plaintiff's upper body functionality was substantially higher after the cervical procedure than beforehand.

As for the Plaintiff's lumbar and lower body, the April and June 2021 visit notes also include reports of Plaintiff once again suffering lower back pain rated at 7 and 5-9 out of 10, respectively. AR 718-19. With physical therapy having proven ineffective, Dr. Orisek recommended minimally invasive reconstruction surgery. AR 719. Plaintiff did confirm on October 13, 2021 that the procedure left her back "sore but definitely…more stable than preoperatively[,]" such that she was able to go to a concert the night before. AR 722. However, the ALJ concedes that Plaintiff once again alleged lower back pain in March 2022, along with tenderness in the sacroiliac joints and markedly positive sacroiliac provocative findings. AR 22, 725. The x-ray revealed "stable appearing L4-5 reconstruction with maintenance of anatomic reduction of the spondylolisthesis[,]" but with "extensive sclerosis indicative of chronic inflammation of the sacroiliac joints[.]" AR 22, 725.

The ALJ's position that these symptoms were not as severe as before the surgery appears to stem from January 2023 findings of "[m]ultilevel lumbar spondylosis without severe central canal stenosis at any levels." AR 22, 1102. The ALJ contrasts these results against a November 2020 MRI that revealed "moderately severe spinal stenosis at L4-5." AR 21, 672. Although the January 2023 MRI categorized the stenosis at this disc as only "mild," it also identified a mild stenosis in the L2-L3 disc where there previously was none. AR 672, 1022. The November 2020 MRI results also do not reveal a "mild facet arthropathy" at the L1-L2 and L2-L3 discs, which the January 2023 results do. AR 672, 1022. The ALJ frames the post-surgical MRI results as an improvement by focusing on improvements in the L4-L5 disc and ignoring degradation in the rest of the lumbar spine.

The ALJ failed to cite evidence showing that either surgery provided more than temporary

17

relief or resulted in long-term improvement as it pertains to the limitations Plaintiff alleged.  Nor is it clear that injections or Tylenol reduced her pain to the point where she could work.  The ALJ did not adequately justify discounting Plaintiff's testimony based on her response to treatment.

6.   The ALJ Erred in Discounting Subjective Testimony Based on Daily Activities

An ALJ should not penalize claimants "for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 722.  An ALJ can cite a claimant's daily routine to the extent that it is inconsistent with the degree of disability that plaintiff alleges.  *See Molina*, 674 F.3d at 1113 (even where claimant's everyday activities reflect difficulty in functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment).  In other words, an ALJ may rely on the fact that a plaintiff "engages in numerous daily activities involving skills that could be transferred to the workplace" if the ALJ "mak[es] specific findings relating to those activities."  *Burch*, 400 F.3d at 680-81.

The ALJ failed to make such findings here, instead listing Plaintiff's daily and monthly activities and finding that they "tend to show that she did have the ability to perform basic work functions."  AR 22-23.  He noted that Plaintiff testified to putting away dishes and folding her own clothes, and admitted during a December 2022 visit with Dr. Anne Priest to walking multiple miles per day and engaging in various forms of exercise about twice a month each.  AR 22-23, 1309, 1328.  Plaintiff also told Dr. Priest that she infrequently served as a mobile notary public and did Pilates instructions/marketing part-time at a fitness club.  AR 23, 1328.

The ALJ did not attempt to translate these activities into specific workplace skills, let alone explain how these activities contradict the limitations Plaintiff alleged during her testimony.  Of particular note are her allegations that she can stand for only 30 minutes at a time, and sit for 45, before needing to rest.  ECF No. 8 at 17; AR 21, 43-44, 47, 53-54.  An ALJ should not assume that the ability to perform tasks for moments at a time, or a few times per month, implies the ability to perform these tasks on a regular and continuing basis, as required in a workplace environment.  ECF No. 8 at 17; *Garrison*, 759 F.3d at 1016.

The ALJ's summary of Plaintiff's daily activities also omits caveats that further underscore the difference between brief periods of activity and the capacity to complete a full

18

workday.  Although Plaintiff worked as a notary, for example, she testified that she only notarizes single documents that require her to sit for no more than 30 minutes.  AR 42.  This is because sitting for more than 45 minutes would compel her to either recline, move around, lie in a massage chair for an hour, or take pain medication.  AR 43-44.  As to her work at the fitness club, she testified that even a desk job in marketing proved too much after a change in her responsibilities required her to sit from four to six hours per workday.  AR 48.  Although getting certified as a Pilates instructor might have helped her avoid pain by limiting how long she would need to stand, that pain kept her from completing the certification requirement.  AR 48-49.  Finally, although Plaintiff admitted to performing chores at home, she also explained that she needed breaks in between and estimated that she spends a total of six hours per day reclining on the couch.  AR 45, 53-54.

The ALJ did not adequately explain why Plaintiff's daily activities merit discounting her subjective testimony.

### 7.  The Errors Are Not Harmless

An ALJ's error is harmless when it is "inconsequential to the ultimate nondisability determination." *Stout v. Comm'r of Soc. Sec. Admin*, 454 F.3d 1050, 1055 (9th Cir. 2006).  The "relevant inquiry … is not whether the ALJ would have made a different decision absent any error … it is whether the ALJ's decision remains legally valid, despite such error." *Carmickle*, 533 F.3d at 1162.  Multiple reasons for a particular conclusion can render an error as to one reason harmless because the others provide "a basis for the court to review the ALJ's decision[.]" *Id.* at 1163; *see also Lambert v. Saul*, 980 F.3d 1266, 1278 (9th Cir. 2020) (refusing to find an error harmless when "the ALJ did not provide enough 'reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence[.]'") (internal citations omitted).  If an ALJ provides multiple "record-supported reasons for discrediting the claimant's testimony," an error in any one reason is harmless on its own.  *Stout*, 454 F.3d at 1055 (citing *Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir.2004)).

As discussed above, the ALJ erred in his assessment of Plaintiff's response to treatment, failed to adequately analyze the effect of her daily activities, and did not identify specific

19

discrepancies between the subjective testimony and the medical record. *See supra* VI.A.4-6. Defendant cites the fact that the ALJ also found persuasive the opinions of state agency medical consultants, who found Plaintiff capable of light work with some limitations. ECF No. 10 at 10; AR 23, 72-76, 90-94. Had the ALJ based his decision to discount Plaintiff's testimony on these opinions, even in part, it might have rendered the errors in other reasons harmless.

As Plaintiff notes, however, the ALJ's assessment of medical opinions appears unrelated to his assessment of Plaintiff's testimony. ECF No. 11 at 5. The ALJ discussed the medical record, Plaintiff's treatment history, and her daily activities before finding that "[t]hese factors suggest that the claimant's alleged symptoms were not fully consistent with and supported by the evidence of record." AR 23. Only afterwards did the ALJ analyze medical opinions and prior administrative medical findings. AR 23. This implies that the ALJ treated these discussions as separate inquiries. A court may not affirm an ALJ's decision as to any one element "on a ground upon which he did not rely." *Orn,* 495 F.3d at 630; *Connett*, 340 F.3d at 874.

In the absence of an additional reason for discounting subjective testimony, the errors identified in the ALJ's decision are not harmless and merit remand for further proceedings.[4]

### B. The ALJ Erred in Discounting Dr. Orisek's Opinions

1. Opinions and Holding

On May 2, 2022, Dr. Orisek opined that Plaintiff could occasionally lift ten pounds but should not perform any "frequent" lifting. AR 758. He estimated that Plaintiff could stand or walk for a total of 30 minutes, and sit for 30-45 minutes, in an eight-hour workday. AR 758. He explained that her pain compels her to toggle between sitting, standing, and walking more than lunch periods and breaks alone would enable. AR 758. As to what limited Plaintiff's standing and walking, Dr. Orisek cited the extensive inflammation of sacroiliac joints following the L4-5 fusion. AR 758. When combined with a limited range of motion and strength, plus numbness and tingling in her extremities, this also precluded any climbing and stooping and limited Plaintiff to occasional balancing, kneeling, crouching, and crawling. AR 758-59.

---

[4] Plaintiff does not seek remand for an automatic award of benefits under the credit-as-true rule in relation to any of her arguments. See ECF No. 8 at 18, 22; *Garrison*, 759 F.3d at 1020.

20

Dr. Orisek further opined that Plaintiff's three cervical spinal surgeries had caused occasional numbness, tingling, and pain in the arms and wrists.  AR 759.  Plaintiff was therefore limited to occasional reaching with either arm, occasional handling and fingering with her right arm, frequent feeling with fingertips on either hand, and frequent handling and fingering with her left arm.  AR 759.  Due to Plaintiff's limited range of motion, her hip and back pain, and the numbness and tingling in her foot, Dr. Orisek further recommended that she avoid heights, moving machinery, and temperature extremes.  AR 759.

Dr. Orisek also completed a separate report on Plaintiff's musculoskeletal limitations. This report explained that she suffered from paravertebral muscle spasms and tenderness, constantly tender sacroiliac joints, and numbness and tingling along the right side of her body including her back, hip, groin, leg, and foot.  AR 761.  Dr. Orisek also rated Plaintiff's ability to move these body parts a 2 out of 5.  AR 761.  He then opined that her gait and her ability to sit were frustrated by her pain, whereas reaching with either arm increased this pain.  AR 762.  He separately reported "extensive sclerosis indicative of chronic inflammation of the sacroiliac joints" following the L4-5 fusion.  AR 762.  Physical therapy had improved her mobility and strength, but neither the cervical nor the lumbar spinal surgeries had reduced Plaintiff's pain.  AR 762.  This opinion therefore limited Plaintiff to lifting and carrying up to ten pounds, and to lifting and carrying up to three pounds over her head.  AR 762.  Dr. Orisek cautioned that he only expected the symptoms in this report to last for one year, however, and that further workup would be necessary.  AR 763.

On January 25, 2024, Dr. Orisek provided an updated assessment supported by notes from a December 2023 office visit.  AR 1157-59.  He reaffirmed that Plaintiff's impairments would prevent her from performing any full-time work, from sitting or walking for more than 45 minutes at a time, and from standing for more than 30 at a time.  AR 1157.  He further estimated that Plaintiff could sit for a total of 2.5 hours in a workday with 15-minute breaks in between, could stand for 1.5 hours in a workday with 30-minute breaks in between, and could walk for 2 hours in a workday with 30-minute breaks in between.  AR 1157.  This meant that Plaintiff needed to lie down or elevate her feet for the remaining two hours of the workday, with the

21

understanding that this would not alleviate her pain. AR 1157. If work required lifting and carrying objects for two to three hours in a workday, Dr. Orisek limited the weight to five pounds or less. AR 1157. He argued that abnormalities on various imaging results supported his assessment, as does Plaintiff's prior treatment history as a whole with details regarding her symptoms and conditions. AR 1157.

The ALJ did not find either of Dr. Orisek's opinions persuasive. AR 23-24. He acknowledged that the May 2022 opinion was "somewhat supported" but inconsistent with the record. AR 23. Aside from citing Plaintiff's regular activities like walking two to three miles per day and working as a mobile notary, the ALJ noted that Dr. Orisek's claim of an altered gait were inconsistent with medical records showing a largely normal gait. AR 23 (citing AR 762). The ALJ then applied these findings to the January 2024 opinion, while also noting that it was supported by progress notes postdating Plaintiff's DLI by over a year. AR 23-24 (citing AR 1158-59).

2.  Governing Law

In evaluating medical opinion evidence for applications filed after 2017, ALJs give no specific evidentiary weight to any particular type of opinion or source, but instead must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources and evaluate their persuasiveness. Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68; *see* 20 C.F.R. § 404.1520c(a) and (b). The factors for evaluating the persuasiveness of a physician opinion include supportability, consistency, relationship with the claimant (including length of the treatment, frequency of examinations, purpose of the treatment, extent of the treatment, and the existence of an examination), specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding" (including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements"). 20 C.F.R. § 404.1520c(c)(1)-(5). Supportability and consistency are the most important factors, and therefore the ALJ is required to explain how both factors were considered. 20 C.F.R. § 404.1520c(b)(2).

Supportability and consistency are defined in the regulations as follows:

> Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ may, but is not required to, explain how the other factors were considered. 20 C.F.R. § 404.1520c(b)(2). The new regulatory framework eliminates the "treating physician rule" and displaces the longstanding case law requiring an ALJ to provide "specific and legitimate" or "clear and convincing" reasons for rejecting a treating or examining doctor's opinion. *Woods v. Kijakazi*, 32 F.4th 785, 789 (9th Cir. 2022). Still, in rejecting any medical opinion as unsupported or inconsistent, an ALJ must provide an explanation supported by substantial evidence. *Id.* In sum, the ALJ "must 'articulate ... how persuasive' [he or she] finds 'all of the medical opinions' from each doctor or other source ... and 'explain how [he or she] considered the supportability and consistency factors' in reaching these findings." *Id.* (citing 20 C.F.R. §§ 404.1520c(b), 404.1520(b)(2)).

### 3. The ALJ Erred in Citing Plaintiff's Daily Activities

Plaintiff also argues that the ALJ failed to explain how her ability to walk two to three miles per day or work as a notary is inconsistent with Dr. Orisek's opinion. ECF No. 8 at 20-21. Defendant responds by citing *Mitchell v. Kijakazi*'s holding that an ALJ can assess an opinion's supportability and consistency based in part on Plaintiff's "contrasting reported activities." ECF No. 10 at 12 (citing Case No. 21-35647, 2022 WL 17547806, at *1 (9th Cir. Dec. 9, 2022)).

That an ALJ can contrast a medical opinion against reported activities says little about what and ALJ must do to justify such a holding. As discussed above, an ALJ must make specific findings that explain how any cited activities are inconsistent with asserted limitations. *See supra* VI.A.6; *Burch*, 400 F.3d at 680-81. *Mitchell* cites *Ford v. Saul*, for example, where the ALJ

23

contrasted a claim that the plaintiff "could not sit or stand for more than five minutes at a time or two hours in a workday" against the fact that he was working six-hour shifts at a job "where she was required to sit and stand for long periods of time." *Mitchell*, 2022 WL 17547806, at *1; *Ford v. Saul*, 950 F.3d 1141, 1155 (9th Cir. 2020).

As Plaintiff notes, here the ALJ did not explain how walking a few miles daily is inconsistent with an allegation that she can only stand and walk for a total of 3.5 hours per workday, switching in between standing and walking. *See* AR 758, 1157. Nor is working as a notary exclusively for shorter documents inconsistent with only sitting for 30-45 minutes. *See* AR 42, 758. As the opinion is currently written, the ALJ cannot discount Dr. Orisek's opinion based on these activities.

> 4. <u>The ALJ Erred in Discounting the January 2024 Opinion for Relying on Post-DLI Evaluation</u>

Plaintiff also argues that ALJ erred by finding Dr. Orisek's 2024 opinion unsupported just because it was accompanied by a report postdating the DLI by over a year. ECF No. 8 at 21; AR 24. She asserts that the opinion itself (AR 1157) did not cite any evidence postdating her DLI. ECF No. 8 at 21. She further argues that under *Lester v. Chater*, a medical evaluation made after the DLI can still be relevant to determining Plaintiff's condition during the relevant period. *Id.* (citing 81 F.3d 821, 832 (9th Cir. 1996)).

Assessing Plaintiff's argument requires understanding precisely when a post-expiration opinion is relevant. The ALJ in *Lester* had emphasized that the opinion at issue postdated the claimant's DLI and was "clearly obtained by the claimant's attorney for the purpose of litigation." 81 F.3d at 832. In finding that the ALJ should not have discounted this opinion, the Ninth Circuit held that "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexpiration condition." *Id.* (quoting *Smith v. Bowen,* 849 F.2d 1222, 1225 (9th Cir. 1988)). The Ninth Circuit relied on its holding in *Smith* that "medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis." 849 F.2d at 1225. At the same time, however, the Ninth Circuit acknowledged precedent that "[a]ny deterioration in her condition subsequent to [the date of her last coverage] is, of course,

irrelevant." *Id.* (quoting *Fyfe v. Finch,* 311 F.Supp. 552, 557 (W.D.Pa.1970)).

Plaintiff also cites *Nadon v. Saul*, where the Ninth Circuit reiterated that a "claimant may establish such continuous disabling severity by means of a retrospective diagnosis." ECF No. 8 at 21; 851 Fed.Appx. 24, 27 (9th Cir. March 30, 2021) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1461 (9th Cir. 1995)). *Nadon* cites *Flaten*, however, which emphasized that a claimant must nevertheless "demonstrate that [their] disability existed prior to the expiration of [their] insured status." 44 F.3d at 1461, n.4 (quoting *Cruz Rivera v. Secretary of Health & Human Servs.,* 818 F.2d 96, 97 (1st Cir. 1986)). This again means that any deterioration in the claimant's condition after her DLI is irrelevant. *Flaten*, 44 F.3d at 1461, n.4 (quoting *Waters v. Gardner,* 452 F.2d 855, 858 (9th Cir. 1971)). Accordingly, courts have upheld decisions to discount evidence postdating a DLI if said evidence does not reflect a plaintiff's degree of impairment during the relevant period. *See, e.g., Trogdon v. Comm'r of Soc. Sec.*, Case No. 1:21-cv-00387-SAB, 2022 U.S. Dist. LEXIS 132380 at *23 (E.D. Cal. Jul. 25, 2022) (discounting medical records from 2018 and 2019 that were "not relevant to…whether Plaintiff was disabled prior to December 21, 2015 (the date last insured)"); *Stidham v. Saul*, Case No. CV 19-54-GF-BMM, 2020 U.S. Dist. LEXIS 266926 at *8-*9 (D. Mont. July 29, 2020) (upholding an ALJ's decision to give little weight to an opinion that "was rendered three years after the DLI and do[es] not assess [plaintiff] during the relevant time period").

Taken together, these cases show that the operative question is whether Dr. Orisek's January 2024 opinion actually reflects deterioration in Plaintiff's condition after the December 2022 DLI. Plaintiff's argument to the contrary appears correct. Admittedly, Dr. Orisek attached the findings of his December 2023 examination, having concluded in May 2022 that such reexamination was necessary. AR 763, 1158-59. He concluded therein, however, that this examination was "consistent with her previous appointment." AR 1158. The opinion does not cite any findings unique to this report, references "[p]rior treatment records" in broad terms, and asserts that Plaintiff has been disabled to the degree alleged since 2016. AR 1157.

The ALJ failed to articulate how Dr. Orisek relied on post-DLI evidence to assert that Plaintiff's RFC is more limited than it would be based on findings from the relevant period alone.

25

The decision to discount the January 2024 opinion therefore penalizes Dr. Orisek solely for making a retrospective diagnosis, which the Ninth Circuit does not allow ALJs to do. The ALJ has failed to show how this affects the supportability of Dr. Orisek's opinions.

### 5. The Error in Supportability is Not Harmless

As discussed above, an error is harmless if the ALJ's decision remains legally valid, particularly when the ALJ has articulated other record-supported reasons for that portion of the decision. *See supra* VI.A.7; *Carmickle*, 533 F.3d at 1162; *Stout*, 454 F.3d at 1055. Because any assessment of a medical opinion must adequately discuss its supportability and consistency (20 C.F.R. § 404.1520c(b)(2)), errors are only harmless if at least one holding for each of these factors survives review.

As to consistency, the ALJ's discussion of daily activities was insufficient to justify discounting Dr. Orisek's opinion. *See supra* VI.B.4; AR 23. However, the ALJ was correct to note inconsistencies between how Dr. Orisek categorized Plaintiff's gait and how it was described in the medical record. *See supra* VI.B.3; AR 23. The errors in the ALJ's consistency analysis are therefore harmless. The Court need not discuss other inconsistencies that Defendant cites[5] between Dr. Orisek's opinion and other pieces of medical evidence. *See generally* ECF No. 10 at 12-13.

Of greater concern is the fact that the ALJ's primary supportability argument, the reliance on a December 2023 examination, misrepresented Dr. Orisek's January 2024 opinion. *See supra* VI.B.4. The only other comment made regarding supportability across the ALJ's discussion of both reports is that the May 2022 opinion "is supported by some clinical findings." AR 23. When discussing the supportability and consistency of an opinion, the ALJ must "provide a coherent explanation of … [his] reasoning … in order to provide sufficient rationale for a reviewing adjudicator or court." *Lopez v. Kijakazi*, Case No. 2:21-cv-2110 DB, 2023 WL 5934652 at *6 (E.D. Cal. Sep. 12, 2023) (quoting *Hardy v. Comm'r of Soc. Sec.*, 554 F.Supp.3d

---

[5] Because the ALJ did not cite such inconsistencies himself, the Court is also prohibited from relying on such *post hoc* rationale for the ALJ's decision. *See supra* VI.A.6; *Orn,* 495 F.3d at 630; *Connett*, 340 F.3d at 874.

900, 906 (E.D. Mich. 2021)).  This district has found that an ALJ cannot meet this burden through a "vague and conclusory assertion" that an opinion was "not supported by the overwhelming…evidence of record[.]"  *Lopez*, 2023 WL 5934652 at *6.  An assertion that "some clinical findings" support a medical opinion, without explaining how or to what extent the word "some" implies that others do not, is equally conclusory and leaves the Court unsure as to how this factor affected the ALJ's analysis.  AR 23.

In the absence of any concrete discussion of supportability that survives judicial review, the ALJ's holding as to Dr. Orisek's opinions does not comply with 20 C.F.R. § 404.1520c(b)(2).  The errors therein are not harmless and merit remand for further analysis.

## VII.  CONCLUSION

For the reasons set forth above, IT IS HEREBY RECOMMENDED that:

1. Plaintiff's motion for summary judgment (ECF No. 8), be GRANTED;

2. Defendant's cross-motion for summary judgment (ECF No. 10) be DENIED;

3. The Commissioner's final decision in this matter be VACATED AND REMANDED for further proceedings, including further development of the record in accordance with this decision; and

4. The Clerk of the Court enter judgment and close this case.

These findings and recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14) days after being served with these findings and recommendations, either party may file written objections with the court.  Such document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Local Rule 304(d).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 27, 2026

SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE